# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 3:23-cr-00010-TCB-RGV |
| | :: | |
| ARTHUR GENE YOUNG | :: | |

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER

Defendant Arthur Gene Young ("Young") is charged in a one-count criminal indictment with possession of a firearm by a prohibited person, in violation of 18 U.S.C. §922(g)(1).  [Doc. 1].[1]  Young has filed a motion to suppress evidence and statements, [Doc. 13], and following an evidentiary hearing on the motion to suppress on January 24, 2024,[2] the parties filed post-hearing briefs, see

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 28] for a transcript of the evidentiary hearing held on January 24, 2024, which will be referred to as "(Tr. at ___)" and cited according to the page number located in the top right corner of the transcript.  In addition, the parties submitted exhibits at the evidentiary hearing, see [Docs. 25, 26, & 27], which will be referred to as "(Gov't Ex. ___)" for the government's exhibits and "(Def. Ex. ___)" for Young's exhibit.

[Docs. 29, 32, & 33].  For the reasons that follow, it is **RECOMMENDED** that Young's motion to suppress evidence and statements, [Doc. 13], be **DENIED**.

## I.  INTRODUCTION

On May 2, 2023, a black male dressed in all black, later identified as Young, entered the CVS store located at 206 Alabama Avenue in Bremen, Georgia, and was observed by the shift manager present at that time, Jessica Martin ("Martin"), scanning a Carmex lip balm at a self-service checkout kiosk and leave with the item without actually paying for it.  (Tr. at 10-13).  Martin informed her store manager, Crystal Alderman ("Alderman"), about this incident via text message. (Tr. at 16-17, 19, 34, 48-49, 58-59; Gov't Ex. 2).

Around closing time on that same day, Young returned to the CVS store and attempted to purchase two gift cards and load them with amounts in excess of $200.00, which required the production of government-issued identification.  (Tr. at 10-14, 16, 22, 24, 26-27, 34-36, 60, 72; Gov't Ex. 1 at 1:42, 2:24-2:28).  Young furnished the employee with an identification card that indicated he had recently been released from a detention center, but the computer system did not recognize this form of identification and Martin, who had attempted to assist the employee with completing Young's transaction, was unable to activate the gift cards for Young as his "debit card would not pay for the gift cards."  (Tr. at 15-16, 24, 26-

27); see also (Gov't Ex. 1).[3]  After approximately 20 minutes, Young "got fed up []
and got mad," accused Martin and the other CVS employee of "trying to take his
money," and left the store with the gift cards.  (Tr. at 12, 15-16, 26); see also (Gov't
Ex. 1 at 19:50-20:19).  Following this second incident, Martin, while on her way
home from her shift, encountered a police officer and informed him about her
interaction with Young.  (Tr. at 17, 42-43, 62-63; Gov't Ex. 2).  She also informed
Alderman via a phone call and through text messages later that night about her
second interaction with Young and that he had made her feel "uneasy."  (Tr. at 17,
19-21, 41, 44, 52, 59-60, 62; Gov't Ex. 2).  Martin suggested that Alderman watch
the store security footage in order to "get a good look" at Young.  (Tr. at 17, 40, 49;
Gov't Ex. 2).

On the following morning, May 3, 2023, Alderman, who was working the
opening shift at CVS, encountered Young at the checkout counter within a minute
of her placing a till in her register.  (Tr. at 48, 50-51; Gov't Ex. 3 at 0:10-0:58).  Young
told Alderman that CVS owed him money for the gift cards he allegedly purchased
from CVS the night before.  (Tr. at 51, 64).  Alderman, suspecting that Young was

---

[3] While Martin was assisting Young, he opened one of the gift cards and she
scanned a lip balm and he tried to swipe the gift card, but it had not been activated
and therefore had no value, which was how Martin attempted to "prove[] to him
that there was no amount loaded on the gift card."  (Tr. at 26-27); see also (Gov't
Ex. 1 at 14:35-15:00, 16:20-17:02, 18:34-19:15).

the individual Martin had warned her about, left the counter and asked a pharmacy technician to keep an eye on the counter while she reviewed the security footage and pulled the transaction records from the night before.  (Tr. at 51-54, 64); see also (Gov't Ex. 3 at 5:36-7:15).  Alderman's suspicions that Young was the same individual who had stolen the lip balm and gift cards were confirmed following her review of the security footage, which also showed that Young was wearing the same clothes he wore the night before.  (Tr. at 54); see also (Gov't Exs. 1, 3, 5, & 6).

Alderman returned to the front counter and provided Young with a print-out of the transactions that had occurred the day prior and attempted to explain to him that he did not purchase any gift cards the previous day and that she did not "think that there[ was] anything that [she could] do for [him]."  (Tr. at 54-55, 65-66, 69; Gov't Ex. 3 at 10:29, 11:13-12:34).   Young became increasingly argumentative, and Alderman felt "very intimidated" and therefore "discreetly" handed the pharmacy technician a note requesting that she contact the police.  (Tr. at 55, 68-70, 73; Gov't Ex. 3 at 13:23-13:30); see also (Gov't Ex. 2).  The pharmacy technician called the emergency 911 line and informed the dispatcher, "We have a gentleman here that's giving us a little bit of trouble and the store manager asked me to call to see if you all could send somebody out" and that he was "arguing with the store manager and she doesn't feel safe."  (Tr. at 55-56; Gov't Ex. 4).  The dispatcher alerted the Breman Police Department ("BPD") that there was a

"dispute in progress" at the CVS involving "a manager and a black male wearing all black," with "tattoos," and "unknown 10-32,"[4] and that he was "at the front arguing with the manager at the moment."  (Gov't Ex. 4).

BPD officers responded to the scene, and Officer Austin Corcoran ("Officer Corcoran") was the first to arrive.  (Tr. at 5, 81; Gov't Ex. 3 at 18:24; Gov't Ex. 6 at 0:01).  Officer Corcoran approached Alderman and asked, "What's going on?" (Gov't Ex. 6 at 0:13-0:15).  Alderman explained that Young "thinks he paid for some gift cards that were never rung up[.]"  (Tr. at 71; Gov't Ex. 6 at 0:14-0:26). Officer Corcoran then turned to Young and asked, "Alright brother, what you got going on right here?"  (Gov't Ex. 6 at 0:28-0:30).  While Young ranted about his parents having linked him to Bitcoin, a "cryptic CashApp card," and that CVS was selling "fake" and "fraudulent cards" and "encrypting s**t over to themselves to where nothing can be found and nothing can be backtraced," among other issues he had, BPD Officer Timothy Schiffbauer ("Officer Schiffbauer"), who was not assigned to uniform patrol that day, arrived on scene to assist Officer Corcoran as he suspected, based on the description relayed over the radio by the 911 dispatcher, that the person arguing with the CVS manager was the same person

---

[4] An "unknown 10-32" means that it is unknown whether the suspect has a weapon.  (Tr. at 79, 95).

he had encountered the night before when the individual refused to leave a Hampton Inn hotel.  (Tr. at 126-29; Gov't Ex. 6 at 0:31-4:44).

BPD Officer Lewis Brad Richards ("Officer Richards") subsequently arrived on the scene, and all three officers positioned themselves several feet away from Young and maintained casual stances while they calmly spoke with Young.  (Tr. at 77, 79-80; Gov't Ex. 5 at 0:03-0:29; Gov't Ex. 6 at 5:44-6:45).   During his conversation with the officers, Young stated, "They call y'all, get me arrested or whatever the case may be, and they can continue to scam the f**k out of people," at which time Officer Schiffbauer responded that "nobody wants to arrest you." (Gov't Ex. 5 at 0:55-1:01; Gov't Ex. 6 at 6:32-6:40).  Young replied that he hoped not "[c]ause I don't want to be arrested."  (Gov't Ex. 5 at 1:02-1:07; Gov't Ex. 6 at 6:40-6:46).  BPD Lieutenant Blane Cochran ("Lt. Cochran") and Officer Casey Vann ("Officer Vann") then entered the CVS store, with Lt. Cochran positioning himself several feet behind Officer Corcoran with his arms folded.  (Tr. at 81; Gov't Ex. 5 at 1:25-1:35; Gov't Ex. 6 at 6:52-7:10).  Young then stated:

> Listen, y'all ain't gonna blitz me.  Alright? Stop that f**k s**t right now.  Okay?  We ain't gonna do none of that s**t right now.  Cause I ain't f***ing with these folks.  These folks are f***ing with me, all right? And it's aggravating, okay?

(Gov't Ex. 5 at 1:35-1:51; Gov't Ex. 6 at 7:13-7:33).

After listening to Young again rant about being "encrypted to a Bitcoin," his parents putting his "real name on some fraudulent s**t," and being "framed for

6

some s**t," among other issues, Lt. Cochran approached Young and asked, "What's going on?" (Gov't Ex. 5 at 2:03-2:55; Gov't Ex. 6 at 7:40-8:32). Young handed Lt. Cochran the gift cards he claimed were purchased from CVS the evening prior, and Officer Corcoran explained that according to Alderman, the gift cards had "never been through the system." (Gov't Ex. 5 at 2:55-3:05; Gov't Ex. 6 at 8:33-8:57). Lt. Cochran then asked Young for his identification, explaining that they needed to write a report on this incident, and Young responded that he appreciated that and then handed some cards to Lt. Cochran, including a Georgia Department of Corrections Conditional Release identification card that bore Young's prison mugshot. (Tr. at 107; Gov't Ex. 5 at 3:37-4:18; Gov't Ex. 6 at 9:16-10:12). While Lt. Cochran was looking at and discussing Young's identification with another officer, Young walked away from the officers and down an aisle inside the store, prompting Lt. Cochran to ask, "Hey dude, where you going man," though he did not pursue Young and rather, another officer walked through the same aisle as Young but Young turned around and walked by him back to the front where the other officers were still standing. (Gov't Ex. 5 at 4:30-5:22; Gov't Ex. 6 at 10:13-10:40).

After returning to the front of the store, Young approached Lt. Cochran and handed him more gift cards that he had pulled off the rack in the aisle and complained about having to scratch off the numbers, among other complaints

about gift cards, to which Lt. Cochran responded by asking Young to "hang tight" so they could figure out what was going on.  (Gov't Ex. 5 at 4:55-5:27; Gov't Ex. 6 at 10:40-11:05).  After Young produced his identification card that indicated he was on parole, Lt. Cochran asked Young questions about his incarceration, and Young explained that he had been released from prison 31 days prior after serving time for an attempted robbery by intimidation, but asserted that he was "framed."  (Tr. at 82, 151; Gov't Ex. 5 at 5:30-5:58; Gov't Ex. 6 at 11:08-11:38).  Young also stated, "I'm 32 years old.  I know how to f***ing go in and tell a mother***er to give me the money, if that's what I wanted to do."  (Tr. at 151; Gov't Ex. 5 at 6:00-6:07; Gov't Ex. 6 at 11:39-11:48).  Young also advised the officers that he had walked to the CVS store.  (Tr. at 109; Gov't Ex. 5 at 6:13-6:17; Gov't Ex. 6 at 11:51-11:53).

At this time, Lt. Cochran walked away from Young and the other officers to speak with Alderman, and about halfway into this conversation, Lt. Cochran motioned for Officer Vann to join them, which he did.  (Gov't Ex. 5 at 6:19-8:43).[5] During this conversation, Alderman explained that Young had given Martin "a little bit of a hard time" and had stolen lip balm and gift cards from the store the night before and that she had confirmed Martin's account of the events by viewing

---

[5] During this time, Officer Corcoran was running Young's identification through the system, and it came back negative for any outstanding warrants.  (Gov't Ex. 5 at 4:55-7:26; Gov't Ex. 6 at 11:08-13:05).

the security footage.  (Tr. at 57, 71, 74).  While they were conversing, Young walked over to Lt. Cochran, Officer Vann, and Alderman and said, "Hey, listen.  Check this out," while the other officers also followed Young.  (Gov't Ex. 5 at 8:31; Gov't Ex. 6 at 14:07-14:23).  At this point, Lt. Cochran informed Young, "We are going to take you home.  You understand?  Your other choice is going to jail, dude, and back to prison."  (Gov't Ex. 5 at 9:00-9:10; Gov't Ex. 6 at 14:24-14:47).[6]  After arguing with Lt. Cochran, Young finally agreed to leave with the officers, but he insisted that he did not need to "be checked" because he would put his backpack in the trunk.  (Gov't Ex. 5 at 9:17-11:36; Gov't Ex. 6 at 14:50-17:05).

Young and the officers proceeded to leave the CVS store and entered the parking lot.  (Tr. at 84, 110; Gov't Ex. 5 at 11:37-11:47; Gov't Ex. 6 at 17:08-17:28).  Lt. Cochran, who along with the other officers, positioned himself several feet away from Young and between Young and the entrance to the CVS store, instructed Young to remove his bag, but Young responded, "Shoot me," to which an officer responded that they were not going to shoot him and asked whether

---

[6] As Young argued with Lt. Cochran, Officer Schiffbauer, who had observed what appeared to be gang-related tattoos on Young, directed Officer Richards' attention to a bulge in Young's right front pocket, which indicated to Officer Schiffbauer the possible presence of a firearm.  (Tr. at 83, 127, 132-33, 135-36, 152; Gov't Ex. 5 at 9:53-9:57).  Officer Richards testified that Lt. Cochran offered to take Young home because he "was trying to . . . de-escalate the situation because [] Young was becoming agitated."  (Tr. at 83).

there was something in the bag.  (Gov't Ex. 5 at 12:10-12:20, 12:27-12:41; Gov't Ex. 6 at 18:04-18:20).  After Lt. Cochran again asked Young to remove his bag or he would have to take him to jail, Young told the officers, "Y'all gonna have to kill me right here," to which Lt. Cochran asked, "you got a weapon on you?"  (Gov't Ex. 5 at 13:03-13:08, 13:15-13:18; Gov't Ex. 6 at 18:40-18:55).  Young responded negatively and then asked, "You think I got a weapon?," to which Lt. Cochran said, "I hope not" and Young then said, "I hope not, either."  (Gov't Ex. 5 at 13:18-13:23; Gov't Ex. 6 at 18:55-19:05).  After the officers continued to reiterate to Young that they wanted to take him home and that they were not trying to take him to jail, Young began to walk away from the officers, exiting the CVS parking lot and proceeding north on Alabama Avenue towards a busy intersection with Highway 78.  (Tr. at 86; Gov't Ex. 5 at 14:11-16:25; Gov't Ex. 6 at 19:49-22:07).[7]

While Young was walking away, Lt. Cochran said "95" to Officer Richards, which was the command to place someone under arrest.  (Tr. at 88-89; Gov't Ex. 5 at 17:50-17:54; Gov't Ex. 6 at 23:30).  At this time, Officer Richards instructed Young to "put [his] bag down" and asked Lt. Cochran what the arrest charges were, to which Lt. Cochran explained that Young had stolen the gift cards, and Officer Richards relayed this to Officer Schiffbauer several minutes later.  (Tr. at 89-91;

---

[7] At this point, Officer Schiffbauer commented to Lt. Cochran, "LT, let me tackle this motherf***er."  (Gov't Ex. 6 at 22:17-22:19).

Gov't Ex. 5 at 18:02-18:36, 25:07-25:13; Gov't Ex. 6 at 23:40-23:53). Young, however, continued to walk away, prompting Officer Richards to command him to "put [his] bag down," to "get on the ground," and to put his hands on his head and that he was "under arrest," and Officer Richards also unholstered his taser. (Tr. at 92-93, Gov't Ex. 5 at 18:36-19:10; Gov't Ex. 6 at 24:10-25:10). Officer Richards continued to repeat these commands, including that Young was under arrest no less than four times over the next minute and for Young to get on the ground no less than six times. (Gov't Ex. 5 at 18:36-19:48; Gov't Ex. 6 at 24:10-26:00). Other officers also repeatedly told Young to stop walking away, to get out of the road, and to just talk to them. (Gov't Ex. 5 at 19:50-20:18). While the officers continued to give these commands, Young stated, "I'll make a deal with you: I give you the gun, you leave me the f**k alone." (Tr. at 94; Gov't Ex. 5 at 20:21-20:25; Gov't Ex. 6 at 25:59-26:03). In response, Officer Richards clarified, "You got a gun," to which Young twice repeated, "I give you the gun, you leave me alone." (Tr. at 94; Gov't Ex. 5 at 20:25-20:32; Gov't Ex. 6 at 26:03-26:10). Officer Richards asked again, "Do you have a gun," and Young replied, "Listen, I give it to y'all, you leave me alone." (Gov't Ex. 5 at 20:32-20:37; Gov't Ex. 6 at 25:10-26:16). Officer Richards then instructed Young "to get on the ground now if you got a gun," to which Young

replied that he did not have a gun.  (Gov't Ex. 5 at 20:37-20:40; Gov't Ex. 6 at 26:16-26:19).[8]

Continuing to ignore the officers' commands and walk away, Young crossed Highway 78 and increased his distance from the officers as he walked alongside the railroad tracks.  (Gov't Ex. 5 at 20:47-21:00; Gov't Ex. 6 at 26:29-26:37).  After some time, a sheriff's deputy who had arrived on scene approached Young from a different direction and pulled him off the railroad tracks and down to the ground.  (Gov't Ex. 5 at 25:42-26:07; Gov't Ex. 6 at 31:24-31:47).  While Young scuffled on the ground with the sheriff's deputy, Officer Richards deployed his taser for a single five-second cycle.  (Tr. at 144-45; Gov't Ex. 5 at 26:09-26:15; Gov't Ex. 6 at 31:48-31:53).  While the officers attempted to place Young in handcuffs, he continued to resist, prompting Officer Richards to warn him that he could be tased again.  (Tr. at 138-39; Gov't Ex. 5 at 26:15-26:30; Gov't Ex. 6 at 31:53-32:09).  During the scuffle, Officer Schiffbauer observed the handle of a firearm in Young's front right pocket, and he called out that Young had a gun.  (Tr. at 136-37, 143, 145-46; Gov't Ex. 5 at 26:33-26:40; Gov't Ex. 6 at 32:05-32:19; Def. Ex. A).  After a minute of

---

[8] After Young made the initial statement about a gun, Officer Richards holstered his taser so that his hands were free in the event the situation escalated and he needed his firearm.  (Tr. at 94; Gov't Ex. 6 at 26:07-26:08).

struggling, it took seven officers to finally secure handcuffs around Young's wrists, and Young was taken into custody.  (Tr. at 152; Gov't Ex. 6 at 32:10-32:30).

On June 27, 2023, a grand jury in the Northern District of Georgia returned a single-count indictment, charging Young with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1).  See [Doc. 1].  On October 10, 2023, Young filed a motion to suppress evidence and statements obtained on May 3, 2023.  [Doc. 13].[9]  Following an evidentiary hearing on January 24, 2024, see [Doc. 28], the parties filed post-hearing briefs, [Docs. 29, 32, & 33], and the pending motion is now ripe for ruling.

## II.  DISCUSSION

Young moves to suppress evidence seized and statements made on May 3, 2023, [Docs. 13 & 29], "because they were acquired within the unbroken chain of events following a Fourth Amendment violation," [Doc. 29 at 1].  Specifically,

---

[9] In his initial motion to suppress, Young also sought to suppress certain inculpatory statements he made to federal agents on May 19, 2023, see [Doc. 13 at 8-9, 15-25]; however, at the January 24, 2024, evidentiary hearing, the government advised the Court that it would not "utilize the statement that was referenced in [Young's] motion to suppress, the last portion of which pertained to a post-arrest interview by [federal agents]," and therefore, "that portion of the motion to suppress need not be litigated, and can be either dismissed or withdrawn or denied as moot," and defense counsel "accept[ed] that representation," (Tr. at 3-4).  Accordingly, it is **RECOMMENDED** that Young's motion to suppress the statements made to federal agents on May 19, 2023, be **DENIED AS MOOT**.

Young argues that the BPD officers "did not have the requisite suspicion to act as they did at each stage of the encounter," pointing out that while the government's "main contention is that [] Alderman's conversation with Lt. Cochran provided probable cause," this "fails as a justification for [] Young's seizure . . . because by then, about 12 and a half minutes after the police encounter, [] Young was already stopped without reasonable suspicion," but that "[e]ven if he had not already been unlawfully stopped, Lt. Cochran's conversation with [] Alderman fails to provide the requisite suspicion" because the "contents of their conversation were not proven." [Id. at 6-8 (emphasis and citation omitted)]. Young also maintains "the gun must be suppressed on the separate grounds that it was the product of an arrest that employed excessive force" and that his "statements must be suppressed because they were obtained in violation of [ his] Fifth and Sixth Amendment rights." [Id. at 2; see also [id. at 13-16].

The government responds that Young "was not seized for [the] first 14 minutes of his 17-minute interaction with the police inside the CVS" after which "[c]ircumstances changed" when "Alderman told [Lt.] Cochran that Young had stolen lip balm and gift cards from the store the night before," which then "provided [Lt.] Cochran with probable cause to believe Young had committed two thefts in violation of Georgia law." [Doc. 32 at 12-13 (footnote and citation omitted)]. The government therefore maintains that "given the existence of

probable cause to support a full-scale arrest, [Lt.] Cochran's ride-home-or-jail ultimatum was an appropriate, if ultimately unsuccessful, de-escalation tactic[.]" [Id. at 15].  The government also maintains that while the "parties probably do not agree when 'the post-arrest encounter' began, and Young does not specify in his brief which statements were elicited unlawfully," presuming that he "is most anxious about the outburst he made regarding firearm possession," that "statement was made voluntary and not in response to custodial interrogation" and Miranda[10] "warnings were not required, and the statement should not be suppressed."  [Id. at 15-16 (citations omitted)].  Finally, the government contends that the officers "did not utilize excessive force to arrest Young, and their necessary use of force does not warrant suppression of any evidence," and that even if excessive force was utilized, Young "does not cite any case holding that suppression of evidence is the appropriate remedy for the use of excessive force in effecting an arrest."  [Id. at 17-18 (emphasis and caps omitted)].  Young has filed a reply in support of his motion to suppress, [Doc. 33], and the Court will address the issues briefed by the parties.

---

[10] See Miranda v. Arizona, 384 U.S. 436 (1966).

A.   <u>**Young's Seizure & Arrest**</u>

"The Fourth Amendment of the United States Constitution guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" <u>United States v. Adigun</u>, Criminal Case No. 1:10–cr–00202–RWS–RGV, 2011 WL 2194253, at *15 (N.D. Ga. May 4, 2011) (alteration in original) (quoting U.S. Const. amend. IV), adopted by 2011 WL 2198308, at *1 (N.D. Ga. June 3, 2011), <u>aff'd</u>, 567 F. App'x 708 (11th Cir. 2014) (per curiam) (unpublished).  "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: '(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'" <u>United States v. Brown</u>, 401 F.3d 588, 592 (4th Cir. 2005) (quoting <u>United States v. Weaver</u>, 282 F.3d 302, 309 (4th Cir. 2002)); <u>see also</u> <u>United States v. Jordan</u>, 635 F.3d 1181, 1185 (11th Cir. 2011); <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989); <u>United States v. Puglisi</u>, 723 F.2d 779, 783 (11th Cir. 1984); <u>United States v. Hunter</u>, Criminal File No. 1:07-CR-310-1-TWT, 2008 WL 552881, at *3 (N.D. Ga. Feb. 25, 2008), adopted at *1.

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place[.]" Florida v. Bostick, 501 U.S. 429, 434 (1991) (internal marks omitted) (quoting Florida v. Royer, 460 U.S. 491, 497 (1983)); see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (citation omitted) (explaining that there is nothing in the Constitution which prevents a police officer from addressing questions to anyone on the streets).  In Bostick, the Supreme Court held that:

> [A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.  So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual and no reasonable suspicion is required.  The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.

501 U.S. at 434 (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).  Even if officers have no basis for suspecting a particular individual, "they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his . . . [property] – as long as the police do not convey a message that compliance with their requests is required."  Id. at 434-35 (internal citations omitted); see also United States v. Graham, No. 2:06-cr-144-WKW, 2007 WL 2746656, at *3 (M.D. Ala. Sept. 19, 2007) (collecting cases), adopted at *1, aff'd, 323 F. App'x 793 (11th Cir. 2009) (per curiam) (unpublished).  An individual's Fourth Amendment right is implicated when he is no longer "free to leave."

<u>Michigan v. Chesternut</u>, 486 U.S. 567, 573 (1988) (citation and internal marks omitted); <u>see also</u> <u>United States v. Mitchell</u>, 407 F. App'x 407, 409 (11th Cir. 2011) (per curiam) (unpublished).  "[T]o determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  <u>Bostick</u>, 501 U.S. at 439; <u>see also</u> <u>United States v. Hunter</u>, 373 F. App'x 973, 976 (11th Cir. 2010) (per curiam) (unpublished).

A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968); <u>see also</u> <u>Miller v. Harget</u>, 458 F.3d 1251, 1257 (11th Cir. 2006); <u>United States v. Lowe</u>, No. CR 311–001, 2011 WL 2600513, at *4 (S.D. Ga. June 16, 2011), adopted by 2011 WL 2710393, at *1 (N.D. Ga. July 12, 2011).  "Some factors which 'might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'"  <u>Hunter</u>, 2008 WL 552881, at *3 (quoting <u>Mendenhall</u>, 446 U.S. at 554); <u>see also</u> <u>United States v. Edwards</u>, No. 1:05-cr-0097-WSD-JFK, 2007 WL 2479288, at *3 (N.D. Ga. Aug. 28, 2007), <u>aff'd</u>, 307 F. App'x 340

(11th Cir. 2009) (per curiam) (unpublished).  "Other factors courts have considered include prolonged retention of a person's personal effects, a request to accompany the officer to the station, and whether the encounter occurred in a nonpublic place or in a small, enclosed space."  United States v. Espinal, Criminal Case No. 1:11–cr–00060–ODE–RGV, 2011 WL 7004195, at *5 (N.D. Ga. Aug. 29, 2011) (citing United States v. Laboy, 979 F.2d 795, 799 (10th Cir. 1992)), adopted by 2012 WL 92451, at *3 (N.D. Ga. Jan. 10, 2012).  "That an officer does not specifically advise the person of his right to walk away does not elevate the encounter into a seizure absent some other evidence of coercion or restricted freedom."  Id. (citing United States v. Hathcock, 103 F.3d 715, 719 (8th Cir. 1997)).  "Additionally, an [officer's] unexpressed intent to detain the individual had []he attempted to leave is irrelevant under the objective standard utilized in determining whether a Fourth Amendment seizure has occurred."  United States v. Hampton, Criminal Case No. 1:11–cr–00410–RWS–RGV, 2012 WL 1354579, at *7 (N.D. Ga. Mar. 5, 2012) (citations omitted), adopted by 2012 WL 1354574, at *1 (N.D. Ga. Apr. 17, 2012), aff'd, 553 F. App'x 955 (11th Cir. 2014) (per curiam) (unpublished); see also Ashcroft v. al-Kidd, 563 U.S. 731, 736 (2011).

Therefore, "[t]he key inquiry is whether, under the totality of the circumstances, 'the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his

business.'" Edwards, 2007 WL 2479288, at *3 (quoting United States v. Baker, 290 F.3d 1276, 1278 (11th Cir. 2002)).  "'That is, where a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated.'" Id. (quoting United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir. 2007)).  Thus, a consensual encounter becomes a Terry stop if the defendant's cooperation "is induced by 'coercive means' or if a reasonable person would not 'feel free to terminate the encounter.'" United States v. Wright, No. 3:06cr447/MCR, 2006 WL 3483503, at *2 (N.D. Fla. Nov. 30, 2006) (citation omitted) (quoting United States v. Perez, 443 F.3d 772, 777-78 (11th Cir. 2006)).

An investigative stop of an individual by law enforcement, as opposed to a police-citizen encounter, triggers Fourth Amendment scrutiny.  Hunter, 373 F. App'x at 976.  An officer may briefly detain a person for an investigative Terry stop only when there exists "reasonable suspicion," based on articulable facts, that "criminal activity may be afoot."  Terry, 392 U.S. at 30; United States v. Sokolow, 490 U.S. 1, 7 (1989) (citation omitted); Hunter, 373 F. App'x at 976.  Officers need not have probable cause.  Sokolow, 490 U.S. at 7 (citation omitted) ("[T]he level of suspicion required for a Terry stop is obviously less demanding than that for probable cause."); see also United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1220 (11th Cir. 1993); United

States v. Cherry, CRIMINAL CASE NO. 1:18-cr-00503-SCJ, 2020 WL 1026712, at *4 (N.D. Ga. Mar. 3, 2020) (citation omitted).

When evaluating the propriety of an investigative stop, the Court must determine whether reasonable suspicion existed in view of the totality of the circumstances.  United States v. Arvizu, 534 U.S. 266, 273-74 (2002); United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).  Although "the concept of reasonable suspicion is somewhat abstract," courts "have deliberately avoided reducing it to 'a neat set of legal rules.'"  Arvizu, 534 U.S. at 274 (citation and internal marks omitted) (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)).  The officer must articulate some minimal, objective justification for an investigatory stop based on the totality of the circumstances and the collective knowledge of the officers involved in the stop.  Sokolow, 490 U.S. at 7-8; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989); United States v. Cotton, 721 F.2d 350, 352 (11th Cir. 1983); United States v. Rodriguez-Alejandro, 664 F. Supp. 2d 1320, 1334-35 (N.D. Ga. 2009), adopted at 1326.  A reasonable suspicion determination must be based on common sense judgments and inferences about human behavior.  Illinois v. Wardlow, 528 U.S. 119, 125 (2000); United States v. Cortez, 449 U.S. 411, 418 (1981); United States v. Reed, 402 F. App'x 413, 415 (11th Cir. 2010) (per curiam) (unpublished).

While the reasonable suspicion standard is not onerous, an officer's reliance on a "mere hunch" is not sufficient to establish reasonable suspicion.  Arvizu, 534 U.S. at 274 (citation omitted); see also United States v. Lopez-Garcia, 565 F.3d 1306, 1313 (11th Cir. 2009).  Factors that have been found to properly support reasonable suspicion include: (1) presence in a high crime area, Wardlow, 528 U.S. at 124; Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972); (2) the hour at which the activity is taking place, Arvizu, 534 U.S. at 274, 277; (3) observation by law enforcement of what appears to be criminal conduct based on their experience, Terry, 392 U.S. at 22-23; and (4) evasive conduct, Wardlow, 528 U.S. at 124; United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975); see also United States v. Marcelino, 736 F. Supp. 2d 1343, 1348-49 (N.D. Ga. 2010), adopted at 1345.  As part of a Terry stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime."  Terry, 392 U.S. at 27; see also Lanigan v. United States, CR418-258, 2019 WL 8013031, at *6 (S.D. Ga. Nov. 25, 2019) (citations omitted), adopted by 2020 WL 865418, at *1 (S.D. Ga. Feb. 20, 2020).  Mindful of these principles, the Court turns to the totality of the circumstances confronting the BPD officers when they encountered Young on May 3, 2023, and the reasonable inferences to be drawn therefrom.  That is, "[b]efore this Court can

determine whether [the BPD officers] . . . had reasonable suspicion to stop [Young], it must first determine the precise moment that the *Terry* stop was executed by the officers, namely, when [Young] was seized, because only the facts available to the officer at the moment of the seizure may be evaluated in determining whether reasonable suspicion warranted the detention." United States v. Haynesworth, 879 F. Supp. 2d 305, 310 (E.D.N.Y. 2012) (citation and internal marks omitted), aff'd, 568 F. App'x 57 (2d Cir. 2014) (unpublished); see also United States v. Gonzalez, 4:22-CR-40119-KES, 2023 WL 6627077, at *6 (D.S.D. July 14, 2023) ("The encounter with [the defendant] ended in his arrest, so the encounter he had with police does trigger Fourth Amendment scrutiny at some point along the continuum of that encounter," but the "question is at what point during the encounter was the Fourth Amendment implicated and, when it was implicated, did the officers have reasonable suspicion or probable cause in support of their actions?"), adopted as modified by 2023 WL 6058876, at *10 (D.S.D. Sept. 18, 2023).

The BPD officers, responding to a 911 call from an employee at the CVS store about an individual, matching the description of Young, having a dispute with the manager, entered CVS and encountered Young, see (Gov't Ex. 4), and while the officers may have lacked any articulable facts at that point to justify a Terry stop since the dispatch report did not provide any articulable facts that would suggest Young was committing a crime or was armed, see (id.), "the encounter between

[Young] and [the] officers began as a consensual one, with officers responding to the scene to assess the situation and help," United States v. Anderson, Criminal Case No.: 1:20-CR-33, 2021 WL 2449103, at *17 (N.D.W. Va. Apr. 14, 2021), adopted by 2021 WL 2102734, at 4 (N.D.W. Va. May 25, 2021), aff'd, No. 21-4576, 2023 WL 34174 (4th Cir. Jan. 4, 2023) (per curiam), and Young "never asked [the officers] if []he could leave" or otherwise attempt to end the encounter, United States v. Salman, 286 F. Supp. 3d 1325, 1339 (M.D. Fla. 2018).  Thus, the officers lawfully approached Young in a public place to ask him questions in response to a 911 call from a CVS store employee, see United States v. Sparks, 594 F. Supp. 3d 9, 17 (D.D.C. 2022) (citations and internal marks omitted) (explaining that it was "well-settled that an encounter between a police officer and a citizen, involving no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other kind of objective justification"); United States v. Brown, CRIMINAL CASE NO. 1:17-CR-142-ELR-LTW, 2018 WL 2925919, at *7 (N.D. Ga. May 10, 2018) (citations omitted), adopted by 2018 WL 2921109, at *2 (N.D. Ga. June 11, 2018), aff'd, 852 F. App'x 524 (11th Cir. 2021) (per curiam) (unpublished), and in doing so, the officers were authorized to ask Young for his identification and to pose other questions, Bostick, 501 U.S. at 434-35; see also United States v. Williams, Case No. CR416-144, 2016 WL 4257744, at *3-4 (S.D. Ga. July 6, 2016) (citation and internal marks

24

omitted) (discussing that "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment" and that "[i]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"), adopted by 2016 WL 4257760, at *1 (S.D. Ga. Aug. 10, 2016); United States v. Moya-Matute, 735 F. Supp. 2d 1306, 1330 (D.N.M. 2008) (citation and internal marks omitted) (explaining that there was "no Fourth Amendment prescription regarding the content of officers' questions during a consensual encounter, so long as the officers' questions [were] not coercive" and while "accusatory, persistent, and intrusive questioning may turn an otherwise voluntary encounter into a coercive one, this [was] true only if the officers convey[ed] the message that compliance [was] required").

The Court also agrees with the government that "Young was not seized for [the] first 14 minutes of his 17-minute interaction with the police inside the CVS," since "[d]uring the first 14 minutes, none of the [five] officers [who were present] threatened or touched Young, displayed a weapon, or employed words, a tone of voice, or even body language that demanded compliance with any of their requests," as Young "was free to (and did) move about the store without any

interference by the police," [Doc. 32 at 12]; <u>see also</u> (Gov't Exs. 5 & 6),[11] but that

"[c]ircumstances changed after Alderman told [Lt.] Cochran that Young had stolen

---

[11] Although Young disputes that he was free to move about the CVS store because the officers had asked for his identification and an officer followed him when he walked to the back of the store, [Doc. 33 at 2], it is undisputed that no law enforcement officer prevented him from walking down the aisle of the store, (Gov't Ex. 5 at 4:30-5:22; Gov't Ex. 6 at 10:13-10:40).  And, while Young argues that at least by the time he was "encircled" by five officers, "there was no doubt of [ his] seizure," [Doc. 29 at 4], the circumstances presented here weigh in favor of finding that the encounter was consensual, including that the officers never physically touched Young, brandished their weapons, spoke in a tone that indicated compliance was necessary, accused Young of specific offenses, unreasonably restricted his movement, or unreasonably retained his identification.  <u>See</u> <u>United States v. White</u>, 81 F.3d 775, 779 (8th Cir. 1996) (finding encounter did not lose its consensual nature due to the presence of three officers, two of whom "were little more than passive observers"); <u>Gonzalez</u>, 2023 WL 6627077, at *7 (citations omitted) (explaining that "[m]erely retaining a suspect's identification, even for up to fifteen minutes, does not constitute a seizure"); <u>United States v. Simon-Marcos</u>, CRIMINAL CASE NO. 1:07-CR-334-MHS-RGV, 2008 WL 11377798, at *6 (N.D. Ga. Apr. 15, 2008) (footnote and citations omitted) (finding defendant's encounter with the officers leading to his arrest was not an unlawful seizure where the "encounter occurred late in the afternoon in a public, non-confined parking lot exposed to public view" and involved three uniformed officers, none of whom displayed a weapon, physically touched defendant, used language or a tone indicating compliance was mandatory, and questioned him about his identity but "did nothing to indicate to [him] that he was not free to leave"), adopted by 2008 WL 11378810, at *1 (N.D. Ga. June 20, 2008), <u>aff'd</u>, 363 F. App'x 726 (11th Cir. 2010) (per curiam) (unpublished); <u>United States v. Rogers</u>, No. 99 CR. 710(CM), 2000 WL 101235, at *11 (S.D.N.Y. Jan. 27, 2000) (finding the "mere presence of four officers (two of whom were positioned well in the background)—unaccompanied by any coercive tactics or objectively intimidating behavior—cannot reasonably be depicted as so overwhelming in itself . . ."), <u>aff'd</u>, 225 F.3d 647 (2d Cir. 2000) (unpublished).

lip balm and gift cards from the store the night before," which then "provided [Lt.] Cochran with probable cause to believe Young had committed [a crime]," [Doc. 32 at 13 (footnote and citation omitted)]; see also (Tr. at 57, 71, 74; Gov't Exs. 5 & 6). At this point, Lt. Cochran informed Young that they were going to take him home and that his other choice was going to jail.  (Gov't Ex. 5 at 9:00-9:10; Gov't Ex. 6 at 14:24-14:47).

Alderman unequivocally testified at the evidentiary hearing that when she walked to the corner of the store with Lt. Cochran, she informed him that Young was the individual "in the store last night giving [Martin] a little bit of a hard time[] and that he had taken some lip balm and some gift cards" and that she had confirmed Martin's account by viewing the security footage.  (Tr. at 57, 71, 74). Young disputes Alderman's testimony, arguing that the "contents of [Lt. Cochran and Alderman's] conversation were not proven," pointing out that the government "failed to call Lt. Cochran," who "was the ranking officer at the scene[] and the officer who decided [] Young was under arrest," and instead decided to "call[] four witnesses who each knew a portion of the operative facts, but none of whom knew the entire story."  [Doc. 29 at 8].  Young contends that while Alderman "tried to tell the Court what she recalled telling Lt. Cochran," she "could not tell us what Lt. Cochran heard or the information he based his decision on" and that "her testimony was not reliable evidence" because "it represents a

significant departure from the things that were recorded from that day" and "she was undoubtedly made aware of the significance of having told Lt. Cochran that the cards were stolen during her preparation to testify," though Young stops short of "say[ing] the [g]overnment did something untoward[.]"  [Id. at 9, 11 (citation omitted)].  Young then speculates as to what he believes "makes more sense that the conversation [] Alderman had with Lt. Cochran" was about and contends that there is simply "no objective evidence proving that Lt. Cochran was told that [] Young had stolen the gift cards prior to his arrest."  [Id. at 11-13 (citation omitted)]. The government responds that although Young has "dedicate[d] approximately one-third of his post-hearing brief to discrediting Alderman's unrebutted, clear, emphatic, and reliable account of what she reported to the police," the "record evidence establishes [that] Young's arrest was constitutionally justified when [Lt.] Cochran finished speaking with Alderman."  [Doc. 32 at 13, 15 (citation omitted)].

Credibility findings are "within the province of the factfinder."  United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (citing United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)); see also United States v. Gopie, 347 F. App'x 495, 499 (11th Cir. 2009) (per curiam) (unpublished) (citation and internal marks omitted) (recognizing that credibility determinations are within the province of the fact finder "because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the

credibility of witnesses").  "In making its credibility determination[s], the Court must take into consideration not only the interests of the witness[es], but also 'the internal consistency of the [witnesses'] testimony, or [their] candor or demeanor on the stand.'"  United States v. Tyler, No. CR 106-075, 2006 WL 2094538, at *7 (S.D. Ga. July 26, 2006) (quoting Ramirez-Chilel, 289 F.3d at 749), adopted at *1.  After considering all the testimony, as well as the interests of the witnesses, the Court finds Alderman's testimony to be credible and Young's arguments to the contrary unavailing.

Alderman clearly testified that she informed Lt. Cochran that Young was the individual "in the store last night giving [Martin] a little bit of a hard time[] and that he had taken some lip balm and some gift cards" and that she had confirmed Martin's account by viewing the security footage.  (Tr. at 57, 71, 74).  While Young attempts to paint a picture that Alderman was confused about what was going on and speculates about her conversation with Lt. Cochran, see [Doc. 29 at 11-12], she did not waver in her testimony as to having informed Lt. Cochran about Young's theft of the lip balm and gift cards the prior evening and that she had confirmed the incidents by watching the security footage, and she even confirmed that this conversation took place when Lt. Cochran pulled her to the side, (Tr. at 57, 71, 74); see also (Gov't Exs. 5 & 6).  And, while Young asserts that "[t]here is no objective evidence proving that Lt. Cochran was told that [ he] had

stolen the gift cards prior to his arrest," [Doc. 29 at 13], the officers' body camera footage from that day belies this assertion.  Indeed, the recordings make clear that as Young walked away from the officers once outside of the CVS store, Lt. Cochran gave instructions to "95" Young and explained to Officer Richards that Young had stolen the gift cards, which, in turn, Officer Richards relayed to Officer Schiffbauer minutes later, (Tr. at 88-91; Gov't Ex. 5 at 17:50-18:36, 25:07-25:13; Gov't Ex. 6 at 23:30-23:53).  The Court finds that Alderman was a credible witness and therefore, Lt. Cochran had a lawful basis to detain and subsequently arrest Young after he concluded his conversation with Alderman.  Because these facts and circumstances provided probable cause to arrest Young for the offense of shoplifting under Georgia law, see O.C.G.A. § 16-8-14(a)(1), any arguments regarding Young's seizure following Lt. Cochran's conversation with Alderman inside the CVS store at which point Lt. Cochran presented Young with the options of either being driven home by the officers or taken to jail are without merit.

**B.**   **Young's Statements**

Young moves to suppress statements he made to law enforcement on May 3, 2023.  [Doc. 29 at 15-16].  Specifically, Young first argues that the statements he made "during the pursuit[] must be suppressed as fruit of the illegal seizure." [Doc. 13 at 14].  However, there was no constitutional violation preceding Young's statements in this case because Young was lawfully questioned during a

consensual encounter that was reasonable in its scope and duration and that subsequently ripened into a full-blown arrest based on probable cause. Accordingly, Young's argument in this regard is without merit, and his motion to suppress his statements as fruit of his illegal detention is due to be denied. Nevertheless, Young also maintains a challenge to his custodial statements independent of any fruit of the poisonous tree argument.

In particular, Young contends that the officers, who followed him as "he pleaded to be left alone" subjected him "to an uninterrupted stream of questions and commands," which were the "functional equivalent of interrogation," but that the "[f]ailure to recite [Miranda] warnings to [ him] rendered his subsequent statements unusable by the [g]overnment." [Doc. 29 at 16 (citation and internal marks omitted)].  The government responds that while Young "moves to suppress statements elicited during the post-arrest encounter on the basis that he was not advised of his rights under *Miranda*," he "does not specify in his brief which statements were elicited unlawfully," but that "[p]resumably, [he] is most anxious about the outburst he made regarding firearm possession," which "was made voluntarily and not in response to custodial interrogation" and therefore not subject to suppression.  [Doc. 32 at 15-16 (citation and internal marks omitted)]. For the reasons that follow, the Court agrees with the government.

"Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning." United States v. Martin, No. 1:14–CR–00427–ELR, 2015 WL 4664889, at *12 (N.D. Ga. Aug. 6, 2015) (citation omitted), adopted at *5. "An officer's obligation to administer Miranda warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" United States v. de los Santos, No. 1:05-cr-372-WSD, 2007 WL 2331070, at *5 (N.D. Ga. Aug. 13, 2007) (citation and internal marks omitted), adopted at *2; see also Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted) ("A 'custodial interrogation' occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action."). Thus, "Miranda warnings are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." United States v. Adams, 1 F.3d 1566, 1575 (11th Cir. 1993) (citation and internal marks omitted).[12]

---

[12] In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Therefore, to address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures officers must follow.

However, "*Miranda* was never meant to apply to all statements taken by the police after a person has been taken into custody, but only to those statements that result from 'express questioning or its functional equivalent.'"   United States v. Springfield, No. CR406-390, 2007 WL 1140912, at *3 (S.D. Ga. Apr. 13, 2007) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)), adopted by 2007 WL 1302282, at *1 (S.D. Ga. May 1, 2007).  Thus, the "special procedural safeguards outlined in *Miranda* are required . . . where a suspect in custody is subjected to interrogation," which "must reflect a measure of compulsion above and beyond that inherent in custody itself."   Innis, 446 U.S. at 300 (footnote omitted).  Young bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[13]  The government bears the burden of

---

Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 467-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."   Id. at 473-74 (footnote omitted).   "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

[13] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

proving that Young's statements were voluntarily given.  Colorado v. Connelly, 479 U.S. 157, 168 (1986).  The government maintains that "because [Young's] statement [regarding making a deal and turning over the gun in exchange for the officers leaving him alone while he was walking away from the officers outside of the CVS] was made voluntarily and not in response to custodial interrogation, Miranda warnings were not required[.]"  [Doc. 32 at 16].

After Young and the officers exited the CVS store and Young refused to remove his bag and get in a patrol vehicle, he began to walk away, prompting Lt. Cochran to instruct Officer Richards to place him under arrest.  (Tr. at 86, 88-89; Gov't Ex. 5 at 12:10-13:23, 14:11-16:25, 17:50-17:54; Gov't Ex. 6 at 18:04-19:05, 19:49-22:07, 23:30).  At this time, Officer Richards directed Young to "put his bag down," but after Young continued to walk away, Officer Richards, who had unholstered his taser, repeatedly commanded Young to put his bag down, get on the ground, put his hands on his head, and that he was under arrest.  (Tr. at 89-93; Gov't Ex. 5 at 18:02-19:48, 25:07-25:13; Gov't Ex. 6 at 23:40-23:53, 24:10-26:00).  While the officers continued to give Young commands, Young stated, "I'll make a deal with you: I give you the gun, you leave me the f**k alone."  (Tr. at 94; Gov't Ex. 5 at 20:21-20:25; Gov't Ex. 6 at 25:59-26:03).  In response to Young's statement, Officer Richards said, "You got a gun," to which Young twice repeated, "I give you the gun, you leave me alone."  (Tr. at 94; Gov't Ex. 5 at 20:25-20:32; Gov't Ex. 6 at 25:10-

26:10).  Officer Richards then asked again, "Do you have a gun," to which Young replied, "Listen, I give it to y'all, you leave me alone."  (Gov't Ex. 5 at 20:32-20:37; Gov't Ex. 6 at 25:10-26:16).  At this point, Officer Richards instructed Young to "get on the ground now if you got a gun," and Young replied that he did not have a gun.  (Gov't Ex. 5 at 20:37-20:40; Gov't Ex. 6 at 26:16-26:19).  For the reasons that follow, the Court finds that Young's statements during this exchange are not due to be suppressed since Young has not shown they were the product of interrogation or its functional equivalent.

The Supreme Court has defined the "functional equivalent" of interrogation as "'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. McKenzie, 132 F. App'x 788, 790 (11th Cir. 2005) (per curiam) (unpublished) (alteration in original) (quoting Innis, 446 U.S. at 300-01).  "In determining whether an exchange was the functional equivalent of an interrogation, the focus of the inquiry is the perception of the suspect, not the intent of the police."  United States v. Suarez, 162 F. App'x 897, 901 (11th Cir. 2006) (per curiam) (unpublished) (citation omitted).  Young has not shown that the officers engaged in any action that they should have known would be reasonably likely to elicit an incriminating response from Young, but instead, the record establishes that the officers did not interrogate Young but

simply gave him commands, and Young made a spontaneous, voluntary statement, "without any compelling influences" in response to the officers' commands to put the bag down and get on the ground since he was under arrest. See Innis, 446 U.S. at 299-301 (excluding words or actions that are "normally attendant to arrest and custody"); United States v. North, CRIMINAL CASE NO. 1:16-CR-00309-WSD-JFK, 2017 WL 9473407, at *10 (N.D. Ga. Aug. 8, 2017) (alterations, citations, and internal marks omitted) (explaining that "basic directives of the kind often attendant to arrest and custody, such as commands directing defendant to sit down, take off his hat, and not retrieve his belongings, were not the functional equivalent of interrogation"), adopted by 2017 WL 3821854, at *6 (N.D. Ga. Sept. 1, 2017); United States v. Anderson, Court File No. 17–cr–79 (JRT/LIB), 2017 WL 3172762, at *3 (D. Minn. June 22, 2017) (footnote and citation omitted) (finding "declarative commands . . . made in the performance of an apprehension were not the functional equivalent of interrogation," as "[s]uch commands in no way reasonably imply questions or seek to elicit statements," but rather, "such commands are clearly declarative; they order actions by [d]efendant and they were intended solely and exclusively to effectuate the task of taking [d]efendant into custody"), adopted by 2017 WL 3168958, at *1 (D. Minn. July 25, 2017); see also United States v. Harkness, 305 F. App'x 578, 583-84 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted) (finding there was no "objective

36

evidence to indicate that the officer should have expected [defendant] to incriminate himself" when he indicated that he was armed).  And, although Officer Richards "followed up on [Young's] statement, that did not convert the interaction into an interrogation." United States v. Sims, 423 F. Supp. 3d 1156, 1162 (D. Kan. 2019); see also United States v. Silvers, NO. 5:18-CR-50-BJB, 2023 WL 2525652, at *4 (W.D. Ky. Mar. 15, 2023) (alteration, citation, and internal marks omitted) (explaining that the law permits "a law-enforcement officer to follow up on the information volunteered by [a defendant]," as it is well-established that "[p]olice may ask clarifying or follow-up questions when a suspect volunteers information").  Absent evidence that Young's statements to law enforcement were the product of interrogation or its functional equivalent, they are not subject to suppression.  See United States v. Jules, 244 F. App'x 964, 972-73 (11th Cir. 2007) (per curiam) (unpublished).

Young argues that since the government "concedes that [] Young was in custody for *Miranda* purposes while still inside CVS" and the "parties agree that the most inculpatory of the statements, and the focus of [] Young's challenge, are the statements that begin 'I'll make a deal with you' which came after the point both sides agree [] Young had been seized," the government contends that Young was not subjected to questioning, but that in doing so, the government has "ignor[ed] the vast majority of the police encounter" as "there were a great many

questions and statements by the police to [] Young that would have the natural effect of eliciting incriminating responses." [Doc. 33 at 13-14 (citations omitted)]. In particular, Young points to Lt. Cochran's statement to Young as Young and the officers were exiting the CVS store to "let him check you first" when Young finally agreed to let the officers take him home and to Lt. Cochran's questions in the CVS parking lot, asking Young whether there was something in the bag when Young said, "Shoot me" in response to Lt. Cochran's instructions for him to remove his bag, and whether Young had a weapon after Young had stated that they were going to have to kill him when Lt. Cochran again asked him to remove his bag, and Young asserts that when he later "offer[ed] to make a deal with the officers by surrendering his gun, it is clear he [was] referencing their initial questioning regarding him having a weapon." [Id. at 14-15 (citations and internal marks omitted)]; see also (Gov't Ex. 5 at 9:17-11:36, 12:10-12:20, 12:27-12:41, 13:03-13:08, 13:15-13:23; Gov't Ex. 6 at 14:50-17:05, 18:04-18:20, 18:40-19:05).

With respect to Lt. Cochran's questions asking whether there was something in the bag and whether he had a weapon on him, it is clear that these were "express question[s] that [were] likely to elicit an inculpatory statement" and had Young "answered [these] question[s] in the affirmative[, which he did not,] the government would likely seek to introduce his response[s] at trial[.]" Sims, 423 F. Supp. 3d at 1161 (citation omitted). While "[t]here is no evidence that [Lt.

Cochran] asked [these] question[s] as a trick to extract an unsworn statement from [Young],” the parties agree that Young had been seized at this point, “he had not been advised of his *Miranda* rights,” “the government has not offered an explanation for the question[s], and [Young’s] response[s were] likely to incriminate himself.” Id. (citation omitted).[14]   However, Young’s argument that

---

[14] The Court acknowledges that “when officers ask questions necessary to secure their own safety or the safety of the public as opposed to questions designed solely to elicit testimonial evidence from a suspect, they do not need to provide the warnings required by *Miranda*.” United States v. Williams, 483 F.3d 425, 428 (6th Cir. 2007) (footnote and internal marks omitted) (quoting New York v. Quarles, 467 U.S. 649, 659 (1984)); see also United States v. Durrah, 384 F. App’x 970, 972 (11th Cir. 2010) (per curiam) (unpublished) (citation omitted) (“The Supreme Court has recognized a ‘public safety’ exception to the *Miranda* rule, under which police may question a suspect before giving *Miranda* warnings when the questioning is necessary to protect the officers’ safety or the safety of the general public.”); United States v. Smith, 322 F. App’x 876, 878 (11th Cir. 2009) (per curiam) (unpublished) (citation omitted) (finding the “officer who initially approached [defendant]” and asked “without giving him *Miranda* warnings” whether he had any weapons on him was authorized to do so under the public safety exception to *Miranda*); United States v. Jones, CRIMINAL INDICTMENT NO.: 2:19-CR-00044-RWS-JCF, 2021 WL 7541382, at *13 (N.D. Ga. Oct. 7, 2021) (citation and internal marks omitted) (explaining that “questions related to public safety are exempted from the *Miranda* requirements”), adopted by 2022 WL 575907, at *7 (N.D. Ga. Feb. 25, 2022); United States v. Hines, Criminal Case No. 1:12–CR–79–SCJ, 2013 WL 6086151, at *3 (N.D. Ga. Nov. 19, 2013) (citation omitted) (finding that the “officers were allowed to ask the [d]efendant about the presence of a weapon in the absence of *Miranda* warnings to protect officer safety”).  The government has not argued that the public safety exception applies in this case, and in any event, the Court need not decide this issue since, as explained hereinafter, Young’s later statements made after he was informed he was under arrest were spontaneous and unprovoked by Lt. Cochran’s initial questions in the CVS parking lot and

"it is clear he is referencing [Lt. Cochran's] initial questioning regarding him having a weapon" when he later offered "to make a 'deal' with the officers by surrendering his gun," [Doc. 33 at 15 (citation omitted)], is without merit and does not warrant the suppression of his statements.

Young's contention that his post-arrest statements should be suppressed appears to be premised on his assertion "that he made only one continuous statement which cannot be broken up into pieces which began from the initial question by [Lt. Cochran]." United States v. Cole, 315 F.3d 633, 636 (6th Cir. 2003) (internal marks omitted). "This fact-specific argument[, however,] is premised on a highly implausible characterization of the events of [May 3, 2023]," as the body camera recordings reveal that Young "clearly made multiple independent statements at the scene . . . even if their content was similar." Id. Indeed, in response to Lt. Cochran's questions in the CVS parking lot, Young had already responded that he did not have anything in his bag or have a weapon and asked the officers whether they thought he had a weapon to which Lt. Cochran said that he hoped not and Young said he also hoped not, (Gov't Ex. 5 at 12:10-12:41, 13:18-13:23; Gov't Ex. 6 at 18:04-18:55), and his later spontaneous offers to make a deal and surrender the gun were "made independently of [Lt. Cochran's earlier]

---

therefore, even assuming an initial *Miranda* violation, this violation supplies no basis to suppress Young's subsequent spontaneous and voluntary statements.

question[s] and were clearly nonresponsive to [them]," United States v. Dennis, Case No. 17-cr-20056, 2017 WL 2332847, at *2 (E.D. Mich. May 30, 2017) (citation omitted).  Thus, "although the statement concerned the same general subject matter—the firearm—as [Lt. Cochran's] [alleged] unlawful question several minutes earlier, the statement was nonetheless spontaneous and not responsive to the narrow question posed by [Lt. Cochran]," especially considering that Young "volunteered [the offer]" and none of the officers had "asked [Young] any additional questions, []or . . . reinitiated conversation." United States v. Wiggins, No. 12–CR–6114L, 2013 WL 1645180, at *8 (W.D.N.Y. Apr. 16, 2013), adopted by 2013 WL 2553971, at *2 (W.D.N.Y. June 10, 2013).  "Because the record reflects that [Young's] statements [about making a deal and turning over the firearm] were spontaneous and unprovoked by [Lt. Cochran's] initial question[s in the CVS parking lot], [any potential] initial *Miranda* violation furnishes no basis to suppress the subsequent statements." Cole, 315 F.3d at 637; see also United States v. Fautz, 812 F. Supp. 2d 570, 646 (D.N.J. 2011) (footnote and internal marks omitted) (explaining that "[c]ourts have not condoned any general concept of a continuing Fifth Amendment violation to exclude allegedly spontaneous statements" and rejecting "defendant's contention that his statements during the transport ride should be excluded as part of a continuing Fifth Amendment violation stemming

from the original inadmissible pre-arrest statements"). Accordingly, Young's motion to suppress statements is due to be denied.

## C. **Excessive Use of Force**

Young further argues that "[e]ven if the police had a sufficient basis eventually to arrest [ him], the way they did it was impermissible," since the officers "tackled [ him], tasered him, and piled on top of him," while he "never did anything aggressive towards the police," but rather, he simply "tried persistently to slowly walk away." [Doc. 29 at 13]. He contends that because "the police used unwarranted force to affect a non-violent arrest," [id. at 14], and that even given the "underdevelopment in case law," the "excessive force should trigger the exclusionary rule," [Doc. 33 at 9]. The government claims that "Young's allegation that officers used excessive, unconstitutional force to effect his arrest is outrageous," but that even if the officers utilized excessive force to arrest Young, Young has not "cite[d] any case holding that suppression of evidence is the appropriate remedy for the use of excessive force in effecting an arrest" and in fact, courts that have "encountered Young's argument have rejected it." [Doc. 32 at 17-19 & n.6 (citations omitted)].

The "Fourth Amendment prohibits the use of excessive force during an arrest," and an "excessive force claim arising from an arrest is analyzed under the Fourth Amendment and its 'reasonableness' standard." Baxter v. Roberts, 54 F.4th

42

1241, 1268 (11th Cir. 2022) (citations and internal marks omitted); see also Draper v. Reynolds, 369 F.3d 1270, 1277 (11th Cir. 2004) (citation omitted).  "Under that standard, the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them."  Baxter, 54 F.4th at 1268 (citation and internal marks omitted).  "The Supreme Court has held that determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) (alteration, citation, and internal marks omitted).[15]

---

[15] "Determining whether an officer's use of force is unconstitutionally excessive involves two steps": (1) "the Court asks whether the specific kind of force used is categorically unconstitutional" and (2) "if the type of force used is not categorically unconstitutional, the Court weighs [ several] factors and then asks whether the amount of force used was excessive."  Clinch v. Chambers, 2:22-CV-94, 2024 WL 644567, at *10 (S.D. Ga. Feb. 15, 2024) (citations omitted).  "This inquiry is an objective one," and the "question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. (citation and internal marks omitted).  The Eleventh Circuit has utilized six factors when evaluating any non-lethal use of force: "(1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted."  Id. (footnote and citation omitted); see also Graham v. Connor, 490 U.S. 386, 396 (1989) (citation omitted) (Supreme Court's instruction that a court should pay "careful attention to the facts and circumstances of each particular

"Moreover, Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (citation and internal marks omitted); see also Graham, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Applying the factors to Young's arrest, the Court concludes that the officers' actions were reasonable and did not amount to excessive force in violation of Young's Fourth Amendment rights.  In fact, the Court agrees with the government that "[t]hroughout their encounter with Young, the officers exercised extraordinary restraint and, ultimately, did only what Young's [] defiance required," including deploying a single, five-second taser cycle to Young once he resisted arrest as other officers scuffled with Young while attempting to handcuff him during which the firearm was observed in Young's front right pocket, [Doc. 32 at 18]; see also (Tr. at 136-39, 143-46; Gov't Ex. 5 at 26:09-26:40; Gov't Ex. 6 at

---

case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").

31:48-32:19; Def. Ex. A).  The body camera recordings demonstrate that Young

"was attempting to evade a lawful arrest by continuing to [walk] away from [the

officers down railroad tracks after crossing a busy highway] and to [repeatedly]

ignore orders to stop," and once he indicated that he might be armed, especially

given the officers' knowledge that Young was on parole and had only recently

been released from prison, to prevent him "from getting away" or reaching into

his bag, the officers attempted to get him off the railroad tracks and on the ground

but a scuffle ensued as Young continued to resist and "a single taser blast" was

utilized "to subdue him," yet it still took seven officers to finally secure Young in

handcuffs.  United States v. Bourrage, 358 F. App'x 776, 780 n.2 (8th Cir. 2010) (per

curiam) (unpublished); see also (Tr. at 89-94, 136-39, 143-46, 152; Gov't Ex. 5 at

18:02-21:00, 25:07-26:40; Gov't Ex. 6 at 23:40-23:53, 24:10-26:37, 31:24-32:30).  After

the officers rolled Young over to sit him up, they continued to check on him and

provided him with water, wiped his mouth, and provided him a cigarette while

they waited for emergency medical personnel to arrive in order to remove the taser

prongs, and upon the arrival of the paramedics, he declined any further medical

attention aside from the removal of the taser prongs.  See (Gov't Ex. 5 at 30:19-

30:20, 31:28-31:35, 31:51-34:24, 37:05-37:09, 41:23-42:39, 42:55-43:09).

Despite Young's arguments about the petty nature of the alleged offense he

committed and the availability of alternate means for addressing the situation, see

[Doc. 33 at 4-8 & n.1], "[u]nder the circumstances, this use of force was objectively reasonable and did not violate the Fourth Amendment," <u>Bourrage</u>, 358 F. App'x at 780 n.2 (citation omitted); <u>see also</u> <u>Baker v. City of Madison</u>, 67 F.4th 1268, 1280 (11th Cir. 2023) (citation and internal marks omitted) (explaining that while "being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury"); <u>Clinch</u>, 2024 WL 644567, at *10-14 (footnote, citations, and internal marks omitted) (explaining that "[t]ackling an arrestee is not categorically unconstitutional" and that "the use of taser can be appropriate in a wide array of situations" and is likewise "not categorically unconstitutional" and finding that the factors weighed against the arrestee and the officers' "actions were objectively reasonable in light of the facts and circumstances confronting them," since, among other things, whether the arrestee had any intention to hurt the officers was not known at the time of the incident; the arrestee refused to cooperate or follow the officers' commands; the "Eleventh Circuit has explained that an arrestee with only one hand handcuffed may pose a danger to officers because without both hands shackled, the single handcuff could be used as a weapon"; the arrestee "actively resisted arrest," despite the officers commands to put his hands behind his back and to get on the ground; the officers' arrest of the arrestee "could have quickly

escalated into a violent incident had [the o]fficer not tased [him]"; "the force used by [the officers] was proportionate"; and the arrestee "admitted that he ha[d] no long-term injuries resulting from th[e] incident"); Singer v. Thompson, Civil No. 3:21-CV-478, 2022 WL 8287197, at *9 (M.D. Pa. May 4, 2022) (citation and internal marks omitted) (explaining that "multiple courts of appeals ha[ve] approved the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders"), adopted by 2022 WL 4536404, at *3 (M.D. Pa. Sept. 28, 2022). Because the Court concludes that the officers' "use of force was reasonable, [the Court] need not address [the parties'] argument[s about whether] suppression is an appropriate remedy for the use of excessive force in effecting an arrest." Bourrage, 358 F. App'x at 780 n.2.[16]  Accordingly, Young's argument that his arrest

---

[16] The Court notes that Young has offered no legal authority to support his assertion that if the officers used excessive force in effectuating his arrest in violation of this Fourth Amendment rights, the exclusionary rule would apply in this criminal case, see [Doc. 29 at 13-15; Doc. 33 at 4-13], and this Court "did not find any Eleventh Circuit Court of Appeals decision applying the exclusionary rule in this situation," United States v. Zamora, Criminal Case No. 1:05-cr-00250-WSD-JFK, at [Doc. 101 at 40 n.19] (N.D. Ga. Dec. 7, 2005), adopted by 2006 WL 418390, at *7 (N.D. Ga. Feb. 21, 2006); see also United States v. Honeycutt, Criminal Indictment No. 2:12–CR–022–RWS–JCF, 2013 WL 5530601, at *8 (N.D. Ga. Mar. 29, 2013) (footnote and citation omitted) (discussing that "[d]efendants ha[d] not pointed to authority, nor ha[d] the undersigned found any, that suppression of evidence . . . [was] required, even where [] use is considered to be excessive force"), adopted by 2013 WL 5530519, at *2 (N.D. Ga. Oct. 3, 2013).  Indeed, it appears that the proper remedy would be for Young to "pursue an excessive force[] constitutional tort claim pursuant to 42 U.S.C. § 1983 if he deems [the officers']

was unlawful is without merit, and it is **RECOMMENDED** that his motion to suppress evidence and statements, [Doc. 13], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Young's motion to suppress evidence and statements, [Doc. 13], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 5th day of June, 2024.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

---

tasing [and effecting his arrest] excessive under the circumstances." <u>United States v. Perkins</u>, CASE NO. 5:22-cr-00254-LCB-HNJ, 2023 WL 9118748, at *17 (N.D. Ala. Oct. 16, 2023) (citation omitted), adopted by 2023 WL 8715826, at *3 (N.D. Ala. Dec. 18, 2023); <u>see also</u> <u>United States v. Collins</u>, No. 1:11–CR–58–TLS., 2012 WL 1576115, at *5 (N.D. Ind. May 4, 2012) (explaining that "[b]ecause the [d]efendant's appropriate remedy for the conduct he claims is excessive force would be a civil action under 42 U.S.C. § 1983, and because there is no causal connection between the alleged excessive force and the obtaining of the evidence against the [d]efendant, suppression is inappropriate, and it would be improper for the Court to reach the question of whether [the officers] . . . used excessive force against the [d]efendant"), <u>aff'd</u>, 714 F.3d 540 (7th Cir. 2013) (per curiam).