**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

UNITED STATES OF AMERICA

v.

ARTHUR GENE YOUNG,

     Defendant.

CRIMINAL ACTION FILE

NO. 3:23-cr-10-TCB

## <u>O R D E R</u>

This case comes before the Court on Chief Magistrate Judge Russell G. Vineyard's report and recommendation ("R&R") [36], which recommends denying Defendant Arthur Gene Young's motion [13] to suppress tangible evidence and statements. Young has filed objections [40] to the R&R.

## I.    Background

On June 27, 2023, Young was indicted on one count of possession of a firearm by a prohibited person following an incident that occurred on May 3, 2023.

On May 2, 2023, Young entered a CVS store in Bremen, Georgia. The shift manager, Jessica Martin, observed Young scan a Carmex lip balm at the self-service checkout kiosk but leave the store without paying for the item. Martin texted the store manager, Crystal Alderman, about the incident.

Later that day, Young returned to the CVS store and attempted to purchase two gift cards. He asked for each gift card to be loaded with amounts over $200, which required him to produce government-issued identification. Young had recently been released from a detention center and provided the employee with his detention center identification card. The system did not recognize this form of identification, and the employee (assisted by Martin) was unable to activate the gift cards. After a twenty-minute heated exchange, Young left the store with the unloaded gift cards.

Martin felt uneasy after the second interaction with Young and informed a police officer that she encountered on her way home about the interaction.

The next morning, Young returned to the CVS store. Alderman was at the checkout counter. Young approached the counter and told

Alderman that he was owed money due to the gift cards he "purchased" the night before. Alderman left the counter to review the surveillance footage to confirm her suspicion that this was the same man who had come to the store the previous day. After confirming her suspicion, Alderman returned to the counter and explained that Young did not purchase any gift cards.

Young became argumentative, and Alderman discreetly passed a note to the pharmacy technician asking that she contact the police. The pharmacy technician told the dispatcher that the man was "arguing with the store manager and she doesn't feel safe." [36] at 4.

Five officers arrived on the scene at different times.[1] Officer Corcoran asked Young and Alderman to describe the situation. At this point, three officers were present, and all were speaking calmly and positioned several feet from Young. While Young was speaking with the three officers, the final two officers arrived, and Young became

---

[1] Officer Austin Corcoran was the first officer to arrive. Officer Timothy Schiffbauer was the second officer. Although he was not assigned to uniform patrol that day, Officer Schiffbauer went to the scene to assist because he suspected (based on the dispatcher's description) that the individual was the same individual he had encountered the previous night who had refused to leave a Hampton Inn. Officer Lewis Brad Richards was the third officer to arrive. Lieutenant Blane Cochran and Officer Casey Vann were the last to arrive.

increasingly aggravated. At this point, Lt. Cochran asked Young for his identification to write a report on the incident.

While Lt. Cochran and another officer were reviewing the identification, Young walked down an aisle in the store. Lt. Cochran asked Young where he was going, but none of the officers pursued Young or told him he could not move. While Young was in the aisle, one of the officers also walked down the aisle. Young passed him and went back to the front with the other officers.

Lt. Cochran noticed that Young's identification card indicated that he was on parole and asked him about his incarceration. Young explained that he had been released from prison thirty-one days earlier after serving time for an attempted robbery by intimidation.

Lt. Cochran then moved to the back of the store and began speaking with Alderman. Alderman explained that Young had stolen lip balm and gift cards from the store the previous night. Lt. Cochran told Young that the officers would take him home and that his other option was that he would go to jail.

Young eventually agreed to leave with the officers but told officers he would put his backpack in the trunk so he did not need to "be

checked." Young continued to refuse to remove his backpack and the situation escalated. Young told the officers that they would "have to kill [him] right here," to which Lt. Cochran asked whether Young had a weapon. Young said he did not have a weapon but asked whether they thought he had one. After around a minute of refusing to remove his backpack, Young begins to walk away from the officers and the CVS.

Lt. Cochran instructs the other officers to arrest Young. The officers continue to ask Young to put his bag down, get on the ground, and indicate that he was under arrest. He was asked repeatedly to stop walking away, to get off the road, and to talk to them. At this point Young says: "I'll make a deal with you: I give you the gun, you leave me the f**k alone." He repeated the statement, then denied having a gun.

Young continued to walk away and was eventually detained by an officer who approached from the opposite direction. The officer who grabbed Young tried to get him off a railroad track, and a scuffle ensued. Officer Richards deployed his taser for one five-second cycle. Young continued to resist the officers' attempts to place him in handcuffs, and an officer noticed a firearm in Young's pocket.

Eventually, seven officers managed to secure Young in handcuffs and take him into custody.

On October 10, 2023, Young filed this motion [13] to suppress tangible evidence stemming from his arrest. Magistrate Judge Vineyard held an evidentiary hearing on January 24, 2024. The parties then filed post-hearing supplemental briefings.

## II.   Legal Standard

A district judge has a duty to conduct a "careful and complete" review of a magistrate judge's R&R. *Williams v. Wainwright*, 681 F.2d 732, 732 (11th Cir. 1982) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. Unit B 1982)). This review may take different forms, however, depending on whether there are objections to the R&R. The district judge must "make a de novo determination of those portions of the [R&R] to which objection is made." 28 U.S.C. § 636(b)(1)(C). In contrast, those portions of the R&R to which no objection is made need only be reviewed for clear error. *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[2]

---

[2] *Macort* dealt only with the standard of review to be applied to a magistrate judge's factual findings, but the Supreme Court has held that there is no reason for the district court to apply a different standard to a magistrate judge's legal conclusions. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Thus, district courts in this

After conducting a complete and careful review of the R&R, the district judge may accept, reject or modify the magistrate judge's findings and recommendations. 28 U.S.C. § 636(b)(1)(C); *Williams*, 681 F.2d at 732. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1)(C).

## III.  Discussion

Young has moved to suppress the statements made and the tangible evidence found (the gun), contending that the statements and the evidence were obtained in violation of his Fourth, Fifth, and Sixth Amendment rights. Specifically, Young contends that he was improperly seized around four minutes into the encounter while in CVS. Because the statements were made and the evidence was found during this illegal seizure, Young contends they must be suppressed. He also

---

circuit have routinely applied a clear-error standard to both. *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1373–74 (N.D. Ga. 2006) (collecting cases). This is to be contrasted with the standard of review on appeal, which distinguishes between the two. *See Monroe v. Thigpen*, 932 F.2d 1437, 1440 (11th Cir. 1991) (when a magistrate judge's findings of fact are adopted by the district court without objection, they are reviewed on appeal under a plain-error standard, but questions of law remain subject to de novo review).

contends that his later statements made while in jail should be suppressed due to violations of the Fifth and Sixth Amendments.[3]

At the January 24 hearing, Young clarified that his motion is intended to suppress the statements he made while he was walking out of the CVS. He also added a new argument—that he was the subject of a custodial interrogation and failed to receive the required *Miranda* warnings. Therefore, he argues in the alternative that the statements should be suppressed due to the Fifth and Sixth Amendment violations.

In his supplemental brief, Young clarifies that the motion relates to the statements "made after he was seized by the police inside the CVS store." [29] at 1. Specifically, "the ones he made after being advised of formal charges[,] [t]he most significant of which regarded the possession of a gun." *Id.* Because he was unlawfully seized four minutes into the encounter, he argues that any statements or substantive evidence obtained should be suppressed.

The Government responds by contending that Young was not seized until the officers had probable cause to arrest him (at around

---

[3] At the January 24th hearing, the Government stated that it will not utilize the statements obtained during the post-arrest interview. Therefore, this portion of the motion to suppress will be denied as moot.

minute fourteen of the seventeen-minute encounter). It contends that it was only when Alderman told Lt. Cochran that Young had stolen the lip balm and gift cards that Young was seized—and that probable cause supported such seizure.

Judge Vineyard issued an R&R, recommending that Young's motion [13] be denied. The R&R agrees with the Government, finding that Young was not seized for the first fourteen minutes of the seventeen-minute encounter and that the subsequent seizure was supported by probable cause. The R&R further rejects Young's arguments that his statements were made in response to the functional equivalent of custodial interrogation and finds that the officers did not use excessive force when arresting Young.

Young objects to the R&R on multiple grounds: (1) he was illegally seized four minutes into the encounter, not fourteen minutes; (2) the illegal seizure tainted all statements and evidence obtained after the four-minute mark; (3) at least a portion of his statements were made in response to a custodial interrogation; and (4) the exclusionary rule is triggered because officers used excessive force to affect his arrest.

## A.   Young's Seizure

The Fourth Amendment guards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Evidence obtained in violation of the Fourth Amendment must be suppressed." *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (citation omitted). But "[n]ot all interactions between law enforcement and citizens . . . implicate the scrutiny of the Fourth Amendment." *Id.* "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may a court conclude that a 'seizure has occurred." *Id.* (alterations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

There are three types of police–citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment. *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).

On one end of the spectrum is the consensual encounter that is based on the principle that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). This is the sort of

encounter in which "a reasonable person would feel free to disregard the police and go about his business." *Id.* (quotation omitted). Police need not have reasonable suspicion for this consensual encounter. *Id.*

The next level of encounter is known as a "*Terry* stop." *See Terry v. Ohio*, 392 U.S. 1 (1968). "Such investigative stops require only reasonable suspicion" of criminal behavior to satisfy the Fourth Amendment. *United States v. Aldridge*, 719 F.2d 368, 370–71 (11th Cir. 1983) (citations omitted).

The final level of police–citizen encounter is a full arrest, for which probable cause of criminal activity is required. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997) ("There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." (citations omitted)).

The Court will first determine when the consensual encounter between Young and the officers became a seizure. Specifically, the issue for the Court is whether Young was seized from minute four or minute fourteen of the encounter in CVS. The R&R concludes that Young was not seized until minute fourteen because "none of the five officers who were present threatened or touched Young, displayed a weapon, or

11

employed words, a tone of voice, or even body language that demanded compliance with any of their requests." [36] at 25 (alterations omitted). The R&R holds that "the officers lawfully approached Young in a public place to ask him questions in response to a 911 call from a CVS store employee." *Id.* at 24 (citation omitted).

After reviewing the evidence, the Court agrees with the R&R's conclusion.

The Eleventh Circuit has articulated a set of factors to consider when determining whether a police–citizen encounter was consensual or constitutes a seizure:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*Jordan*, 635 F.3d at 1186 (quotation omitted).

In considering the above factors, the Court must keep in mind that the "ultimate inquiry [is] whether a person's freedom of movement was restrained by physical force or by submission to a show of authority." *Id.* (citation omitted).

Around seven minutes into the encounter, the fourth and fifth officers arrive at the scene. Each of the officers keeps a respectful distance from Young, but they do form a semi-circle around him, leaving him without a clear path to leave the area. At this point, Young states: "Listen, y'all ain't gonna blitz me. Alright? Stop that f**k s**t right now. Okay?" According to Young, this statement demonstrates his "fearful awareness that he was about to be forcefully arrested." [40] at 2.

Young points to the number of officers as the primary reason the encounter was a seizure but fails to acknowledge that the other factors show that the stop was consensual. Young recognizes that no one factor "by itself, constitute[s] a Fourth Amendment seizure," but still contends that the totality of the circumstances constitutes a seizure. *Id.* at 5 (emphasis omitted). Although multiple officers were present, none used threatening language or a threatening tone of voice or made any movement to pull their weapons or physically touch Young, nor did they ask him for identification until around the nine-and-a-half-minute mark. Young continues to speak calmly with the officers and says that

he "appreciates" that the officers will write a report when asked to provide his identification.

Young also contends that the R&R mischaracterizes the moment he walks down an aisle of the CVS. He argues that the R&R fails to recognize that Young was followed by an officer, that he was asked where he was going, and that the officer turned around and followed him back to the front of the store. The Court disagrees with Young's characterization of such action as a "police accompaniment." *Id.* at 7. Rather, Young randomly turns around and walks down the aisle behind him without making any statement as to where he is going. While he is walking down the aisle, the officers still hold his identification and are reviewing the "receipt" Young had for the gift cards. Young turns around and walks away without warning and does not respond when Lt. Cochran asks where he is going. The officer who followed Young down the aisle does not grab him or ask him to return. Rather, Young reaches the end of the aisle, grabs some gift cards, and brings them back with him. He is not coerced or asked to return, but he voluntarily hands the gift cards to Lt. Cochran to inspect.

For the foregoing reasons, the Court disagrees with Young and finds that the totality of the circumstances shows that the interaction was consensual until around minute fourteen.

At the fourteen-minute mark, Young walks to the back of the store, where an officer is speaking with Alderman. Before Young approaches, Alderman tells the officer that Young had stolen a lip balm and the gift cards.[4] This gives the officers probable cause to effectuate a seizure and arrest. Young contends that whether there was probable cause at this point is irrelevant because he had been seized without reasonable suspicion until then. However, based on the above, the Court disagrees that the interaction ran afoul of the Fourth Amendment.

By the time Young walks to the back of the store to join the officer and Alderman, the officers have probable cause to arrest him. But the officers give Young a choice—they can either take him home or arrest him. Since the officers had probable cause at

---

[4] The R&R provides an in-depth analysis regarding the credibility of Alderman's statement. Young does not object to the R&R's analysis on this issue, so the Court will accept the R&R's determination of Alderman's credibility.

this point, any arguments related to Young's seizure from this point on lack merit.

### B.   Young's Statements

The R&R rejects Young's argument that his statements were made as result of his illegal detention and therefore should be suppressed as fruit of the poisonous tree. Young does not object to this conclusion.

The R&R also concludes that Young's statements were not made during the course of a custodial interrogation because Young's statements about the gun were spontaneous and voluntary. Young objects to this conclusion, contending that the statements were made in response to officers' questioning.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that "statements offered while a suspect was in 'custodial interrogation'" cannot be used "unless that suspect was informed of his rights." *Bowen v. Sec'y, Fla. Dep't of Corr.*, 92 F.4th 1328, 1334 (11th Cir. 2024) (quoting *Miranda*, 384 U.S. at 444). The

*Miranda* protections apply only to instances of custodial interrogation, which is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (quoting *Miranda*, 384 U.S. at 444).

Interrogation for *Miranda* purposes "includes both 'express questioning' and 'its functional equivalent.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980)). "The functional equivalent of express questioning . . . encompasses 'any words or actions' by the police that they 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301).

A defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). The government bears the burden of proving that a defendant's statements were voluntarily given. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

After reviewing the record, the Court agrees with the R&R's conclusion that Young's statements should not be suppressed because

the statements were not a product of interrogation or its functional equivalent.

Young followed the police out of the CVS when given the option to be taken home. Before ever receiving any instruction on removing his backpack, Young told the officers that he did not need to be checked because he would place his backpack in the trunk of the car. After being instructed to remove his bag, Young refused and responded, "Shoot me." After continuing to refuse to remove his bag, he told the officers that they would "have to kill [him] right here," and, in response, Lt. Cochran asked whether Young had a weapon. Young denied having a weapon and asked whether the officers thought he had one. It is unclear whether Young seeks to suppress this set of statements, but regardless, the Court agrees with the R&R's conclusion that "the parties agree that Young had been seized at this point, he had not been advised of his *Miranda* rights, the [G]overnment has not offered an explanation of the questions, and Young's responses were likely to incriminate himself." [36] at 39 (alterations and quotations omitted).[5]

---

[5] As the R&R notes, the Government did not argue that the public safety exception to *Miranda* applies, so the Court need not address whether the exception applies for this set of statements.

Based on the supplemental briefing, it appears that the statement Young intends to suppress is his later statement, namely, "I'll make a deal with you: I give you the gun, you leave me the f\*\*k alone." In support of suppression, Young argues that this statement is part of the "single ongoing exchange." Young objects to the R&R's conclusion that this statement was independent, contending that the statement was "made in response to the ongoing police pressure." [40] at 8.

The Court overrules Young's objection and agrees with the R&R's conclusion that Young's statement was not the product of a functional equivalent to interrogation.

Lt. Cochran first asked Young if he had a weapon around nineteen minutes into the encounter. It was not until around twenty-six minutes into the encounter that Young made the "I'll make a deal with you" statement. In between those two statements, Young continued to walk away from the officers despite multiple warnings that he was under arrest, to put his bag down, and to get on the ground. It was in response to these commands that Young voluntarily and independently told police that he would make a deal with them. The officers were not giving Young directions to elicit an incriminating response—they were

giving him instructions to effectuate his arrest. As the R&R finds, it would be a "highly implausible characterization" to accept Young's argument that all his statements were "one continuous statement which cannot be broken up into pieces." [36] at 40 (quoting *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003)).

As a result, the Court concludes that the statement was not made as a result of the functional equivalent of interrogation and will deny the motion to suppress on this ground.

### C.   Excessive Force

The R&R also rejects Young's contention that the police used unwarranted force to affect his arrest and that the use of excessive force triggers the exclusionary rule. Young objects to the R&R, contending that it improperly applies the six-factor test articulated in *Wade v. Daniels*, 36 F.4th 1318, 1325 (11th Cir. 2022), to determine whether police used excessive force.

The "Fourth Amendment prohibits the use of excessive force during an arrest." *Baxter v. Roberts*, 54 F.4th 1241, 1268 (11th Cir. 2022) (citation omitted). To determine whether excessive force is used, "the question is whether the officers' actions are objectively reasonable

in light of the facts and circumstances confronting them." *Id*. (quotation omitted). "That means we determine whether the seizure was objectively reasonable . . . from the perspective of a reasonable officer on the scene." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) (quotation omitted). The Eleventh Circuit has articulated the relevant factors to consider when evaluating whether the use of force was excessive:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.

*Wade*, 36 F.4th at 1325 (citation omitted).

Young objects to the R&R's analysis, contending that it "dedicated virtually no time" to the first factor and that the other factors all weigh in his favor. [40] at 9–10.

In weighing the factors anew, the Court concludes that the R&R's analysis is correct.

This Court recognizes, as the R&R does, "the petty nature of the alleged offense." [36] at 45. But none of the factors alone is determinative.

The Court determines whether the suspect poses an immediate threat of harm "[f]rom the perspective of any reasonable officer witnessing th[e] scene." *Messick v. Bryant*, No. CV 322-021, 2023 WL 7726478, at *6 (S.D. Ga. Nov. 15, 2023). The officers on the scene were uncertain whether Young had a gun, knew that he had recently been released from prison after serving time for an attempted robbery by intimidation, and had been attempting to effectuate his arrest for nearly ten minutes. Although the risk of harm was not definite, the officers were reasonably concerned that the situation could escalate.

As for factor three, Young's contention that there was little active resistance or flight grossly mischaracterizes the scene. Young was being followed on foot by several officers for several minutes despite being told several times that he was under arrest and to get on the ground. He continued to walk away from the officers. When another officer approached from the other direction, he attempted to evade that officer and run over the train tracks to escape.

As to the need for the use of force, "courts have found that there is a clear need for the use of force when criminal suspects physically resist, ignore commands, menace officers, or lead them on an extended

chase." *Pequeno v. Seminole Cnty. Ga.*, 623 F. Supp. 3d 1337, 1354

(M.D. Ga. 2022) (quotation and alterations omitted); *Messick*, 2023 WL

7726478, at *6 (explaining that in *Prosper v. Martin*, 989 F.3d 1242

(11th Cir. 2021), "the Eleventh Circuit affirmed that the use of a taser

to subdue a suspect who repeatedly ignores police instructions and

continues to act belligerently toward police is objectively reasonable").

Here, Young ignored commands, indicated he had a gun, and led

officers on an extended foot chase. The need for force was evident.

As for factors five and six, the Court concludes that the amount of

force used was "reasonably proportionate to the difficult, tense[,] and

uncertain situation." *See Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th

Cir. 2004) (holding that an officer's single use of a taser was not

excessive force when the truck driver became "hostile, belligerent,

uncooperative," and ignored officer's commands following a traffic stop).

Although Young was tased, he suffered no lasting injury. Officer

Richards tased Young only one time for a five-second cycle while Young

and another officer were tussling on the ground around the railroad

tracks. And Young was warned that he would be tased if he did not

adhere to the officers' instructions. *See* [32] at 17 (quoting the bodycam

footage, showing that one of the officers told Young twice that he "do[es] not want to tase [him]").

Because the Court concludes that the officers did not use excessive force, it need not determine whether suppression of evidence is the appropriate remedy.

## IV. Conclusion

For the foregoing reasons, the Court adopts the R&R over Young's objections. Young's motion [13] to suppress evidence and statements is denied.

IT IS SO ORDERED this 12th day of July, 2024.

Timothy C. Batten, Sr.
Chief United States District Judge